UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>KENNEDY HUSSAIN | Case No. 21-CR-608-1<br><br>Judge John Robert Blakey |

**MEMORANDUM OPINION AND ORDER**

On December 22, 2020, Kennedy Hussain arrived at O'Hare International Airport on an international flight from Yemen, via Frankfurt, Germany. [74] ¶¶ 7–8. When he arrived in Chicago, Customs and Border Protection agents stopped him, took temporary possession of his cellphone, and scrolled through it by hand. *Id.* ¶¶ 12–13, 15. The fruits of that border search led to his arrest and indictment here. Defendant has moved to suppress that evidence. *See* [74]. Based upon the parties' briefs and arguments, and the hearings held April 2, 2024 and May 6, 2024, this Court now denies his motion to suppress.

**I.     Court Proceedings & Findings of Fact**

On December 22, 2020, shortly after 2:00 p.m., Kennedy Hussain arrived at O'Hare International Airport on an international flight from Frankfurt, Germany, originating in Jubal, Yemen. [74-1] ¶¶ 2–4. At that time, Hussain was traveling alone, with three bags and $6 USD. *Id.* ¶ 15. He arrived at Terminal 5 and passed through a primary inspection area where Customs and Border Protection ("CBP") Officer Audrey Diamond checked his passport and referred him for secondary

inspection. *See* [74-1] ¶ 7; [85] at 7–8. At secondary inspection, Hussain interacted with CBP Officer Jenny Pila, who referred Hussain to CPB's Tactical Terrorism Response Team ("TTRT"). [74-1] ¶¶ 8–9. TTRT Officer Elias Sepulveda conducted an initial, manual search of Hussain's cellphone and observed "derogatory content," including possible child pornography. *Id.* ¶ 14. After consulting the Department of Homeland Security ("DHS"), CBP then seized the phone but allowed Hussain to leave. *Id.* ¶¶ 15–17. DHS agents then obtained a warrant and conducted more extensive searches of Defendant's phone, ultimately uncovering a cache of pornographic images and videos featuring children. [74-7] at 2–3; [75] at 1.

Based in part upon evidence obtained from Hussain's phone, a grand jury indicted Hussain on September 28, 2021 with knowingly transporting child pornography in violation of 18 U.S.C. § 2252(A)(a)(1) and (b)(1) and knowingly possessing material—namely, an Apple iPhone X, containing child pornography—in violation of 18 U.S.C. § 2252A(a)(5)(B and (b)(2). *Id.* ¶ 23; [1]; [2].

On February 2, 2024, Hussain moved to suppress the evidence seized from his cellphone, as well as all derivative evidence, arguing that CBP's manual search of the phone violated the Fourth Amendment.[1] *See* [74]; *Wong Sun v. United States*, 371 U.S. 471, 487–88 (1963) (suppressing unlawfully obtained evidence and any "fruit of the poisonous tree"). The government opposed the motion, and the Court held an evidentiary hearing on April 2, 2024 to resolve any factual disputes. At the hearing,

---

[1] On December 23, 2020, Special Agent Ilg submitted an application and affidavit for a search warrant for Defendant Hussain's cellphone, [74-5], and the warrant issued upon probable cause. *Id.* Defendant does not challenge the existence of probable cause to support the warrant or assert any other independent challenge to the warrant itself. *See* [87] at 32–33.

2

the parties offered various stipulations, and then Hussain called to testify the officers and agents involved in the search: CBP Officers Audrey Diamond, Jenny Pila, and Elias Sepulveda, and DHS Special Agent Nicholas Ilg.[2] *See* [85].

CBP Officer Diamond testified that the primary inspection officer routinely asks incoming individuals questions about what countries they visited, how long they were away, whether they carried any food items or alcohol or tobacco products into the country, and whether they carried more than $10,000 in currency. [85] at 14. Officer Diamond testified that, after screening Defendant Hussain in this manner, she wrote "IRT?"—meaning "internal revenue tax"—so that the next available officer would ask more questions; although Officer Diamond had no independent recollection of her specific encounter with Mr. Hussain, she testified that her note would "probably signify" that she asked Hussain about alcohol or tobacco products, and he either indicated that he possessed some or answered her questions in a way that led her to want to make sure another officer questioned him further. *Id.* at 13; [74-9]. In any event, based upon the interview, Officer Diamond sent Defendant to secondary screening. [85] at 14.

When Hussain arrived at baggage control secondary, he interacted with CBP Officer Jenny Pila, who learned that Hussain carried several cartons of cigarettes, some cologne, and $6.00 USD, and had been in Yemen for 5 months. [85] at 31–33.

---

[2] Based upon the in-court proceedings, this Court finds that CBP Officers Diamond, Pila, and Sepulveda and Special Agent Ilg testified credibly. *United States v. Thurman*, 889 F.3d 356, 366 (7th Cir. 2018) (Generally, the trial court's credibility determinations are entitled to deference "because, unlike our review of transcripts, the district court 'had the opportunity to listen to testimony and observe the demeanor of witnesses at the suppression hearing.'") (quoting *United States v. Biggs*, 491 F.3d 616, 621 (7th Cir. 2007) and *United States v. Parker*, 469 F.3d 1074, 1077 (7th Cir. 2006)).

She testified that her notation on Hussain's customs declaration form, "6 – 7 cartons," reflected a potential concern that Defendant may have been failing to declare all of his tobacco products to avoid paying taxes. [85] at 40. Officer Pila further testified that, in response to questions, Hussain indicated that he had gone to Yemen to get married and had left the country with $10,000; but Pila could see, based upon a prior CBP close out, that Hussain had given the exact same explanation in 2019, indicating at that time that he also went to Yemen to get married, and also carried a significant sum of cash. *Id.* at 39–40. Because Hussain's responses raised various red flags about his honesty, as well as potential marriage fraud and tax evasion concerns, Officer Pila referred Defendant to the TTRT. *Id.* at 42; [74-14] at 2; [74-3] at 3; [74-4] at 2.

CBP Officer Elias Sepulveda testified that, at the TTRT inspection area, Defendant presented a U.S. passport with Yemeni stamps. *See* [74-3] at 2; [74-8]. Sepulveda questioned Defendant about his travels, the discrepancy in his cash holdings, and any contact he may have had with foreign entities or terrorist organizations while abroad. [85] at 52; [76] at 8. Defendant explained that he traveled to Yemen to marry Dafer Alomery, whose name he admitted he did not know how to spell, and that he used all of the money he carried to Yemen to finance his wedding. [74-3] at 2. When asked about the prior marriage report, Defendant stated that he had previously been married but had gotten into a fight and divorced the wife he married just the previous year. *Id.*

4

Officer Sepulveda testified that Hussain also presented his cellphone, an iPhone X, for inspection. [85] at 53. Sepulveda put the phone on airplane mode, unlocked it using the password Defendant provided, and then manually scrolled through the phone; while scrolling Officer Sepulveda almost immediately observed what appeared to be child pornography and evidence of possible terrorist activity. *Id.* at 55–59; [74-4] at 2; [74-5] at 3; [74-15] at 2; [76] at 16. Sepulveda testified that he could not specifically remember everything he observed on Hussain's phone, but he did recall seeing one video clip showing an underage male child masturbating and sticking his finger in his rectum. [85] at 60. Upon discovering this material, Sepulveda consulted with his supervisor and then contacted DHS, which advised him to seize the phone. *Id.* at 61. Officer Sepulveda testified that he seized the phone and then released Hussain. *Id.* He testified that he did not make a copy of the contents of Hussain's phone. *Id.* at 74.

Finally, Nicholas Ilg, a Special Agent with DHS who serves as a criminal investigator for Homeland Security Investigations ("HSI"), testified that, on December 22, 2020, he received notification that CBP had identified potential contraband at O'Hare; he responded and conducted a limited manual review of the subject cell phone. [85] at 81–82. Special Agent Ilg testified that, by the time he arrived at O'Hare, Hussain had already been released. *Id.* at 82. Ilg accessed the phone, proceeded to the photo gallery, and, in less than five minutes, identified several videos containing child sex assault material or child pornography. *Id.* at 85, 96. He then returned to his office to secure the phone. *Id.* at 85. Shortly thereafter,

Ilg testified, he consulted the United States Attorney's office and sought application of a search warrant, detailing the information leading to the seizure of Hussain's phone. *Id.* at 86–87. Special Agent Ilg testified that, after obtaining the search warrant, HSI's computer forensic agent performed a forensic extraction of the phone, and, based upon the information retrieved from the cellphone, Ilg obtained an arrest warrant and traveled to Mississippi to arrest Hussain. *Id.* at 87–89.

At the conclusion of the evidentiary hearing, defense counsel asked the Court to schedule oral argument for a later date, so that counsel could have the benefit of the hearing transcript before proceeding. The Court granted that request, and the parties returned on May 6, 2024 to argue the motion, *see* [87]. The Court took the matter under advisement, indicating that it would issue a written decision in due course. This ruling constitutes the Court's findings of fact and conclusions of law on Defendant's motion [74].

## II. Analysis & Conclusions of Law

The Fourth Amendment protects "against unreasonable searches and seizures." U.S. Const. amend. IV. In the absence of a warrant, a search is reasonable "only if it falls within a specific exception to the warrant requirement." *Riley v. California*, 573 U.S. 373, 382 (2014). One such exception applies at the country's borders, including at international airports, which are "the functional equivalent of an international border." *United States v. Wanjiku*, 919 F.3d 472, 480 (7th Cir. 2019). *See also Almeida-Sanchez v. United States*, 413 U.S. 266, 273 (1973) (noting that "a search of the passengers and cargo of an airplane arriving at a St. Louis airport after

6

a nonstop flight from Mexico City would clearly be the functional equivalent of a border search"); *United States v. Ramsey*, 431 U.S. 606, 616 (1977) ("That searches made at the border, pursuant to the long-standing right of the sovereign to protect itself by stopping and examining persons and property crossing into this country, are reasonable simply by virtue of the fact that they occur at the border, should, by now, require no extended demonstration."); *United States v. Montoya de Hernandez*, 473 U.S. 531, 537 (1985) ("Since the founding of our Republic, Congress has granted the Executive plenary authority to conduct routine searches and seizures at the border, without probable cause or a warrant.").

Defendant first argues that the border exception does not apply because the search of his cellphone was not "routine" and remained unrelated to any governmental interest in regulating the border. Neither argument finds support in the facts or law.

First, under *United States v. Mendez*, 103 F.4th 1303 (7th Cir. 2024), a case with remarkably similar facts, CBP Officer Sepulveda's manual "scrolling" search constituted a lawful routine border search. Mendez, like Hussain, arrived at O'Hare International Airport on an international flight, and CBP subjected him to a secondary inspection where a CBP agent unlocked and manually scrolled through his cell phone and found child pornography in his photo gallery. *Id.* At that time, CBP had flagged Mendez based upon his arrest record and his prior travel history; he was also traveling alone and returning from Ecuador, "which CBP officers classified as a

7

potential child-trafficking source country."[3] *Id.* Mendez argued that the search of his phone required a warrant and probable cause or at least reasonable suspicion. *Id.*

The Seventh Circuit rejected his arguments. *Id.* at 1306–11. In particular, the court held that "searches of electronics at the border—like any other border search—do not require a warrant or probable cause" and "routine, manual" searches performed at the border do not even require "individualized suspicion." *Id.* at 1305. The holding applies with equal force here.[4]

The Court also rejects Defendant's argument that the search was unrelated to any legitimate border purpose. Initially, neither the Supreme Court nor the Seventh Circuit has ever cabined the border exception in the manner urged. On the contrary, the Supreme Court has instructed that border searches "are reasonable simply by virtue of the fact that they occur at the border." *Ramsey*, 431 U.S. at 616.

---

[3] Although Hussain came from Yemen, not Ecuador, both countries carry circumstantial significance in weighing the totality of circumstances for CBP investigative purposes; as Officer Sepulveda testified, Hussain had come from a specific part of Yemen experiencing ongoing terrorist activity. [85] at 65.

[4] This Court follows binding Seventh Circuit precedent and rejects the Ninth Circuit's decision in *United States v. Cano*, which, in contrast to the majority of circuit courts, held that "cell phone searches at the border, whether manual or forensic, must be limited in scope to a search for digital contraband." 934 F.3d 1002, 1007, 1017–18 (9th Cir. 2019). The other circuit courts have endorsed a rule consistent with *Mendez*. *See Alasaad v. Mayorkas*, 988 F.3d 8, 20 (1st Cir. 2021) (The "border search exception is not limited to searches for contraband itself rather than evidence of contraband or a border-related crime."); *United States v. Gurr*, 471 F.3d 144, 149 (D.C. Cir. 2006) (holding that in the context of border searches, the "distinction ... between contraband and documentary evidence of a crime is without legal basis"); *United States v. Xiang*, 67 F.4th 895, 900 (8th Cir. 2023) (rejecting argument that the Fourth Amendment does not permit border searches for evidence); *United States v. Nkongho*, No. 22-4261, 2024 WL 3350850, at *5-6 (4th Cir. July 10, 2024) (Despite "the privacy interests at stake, forensic searches conducted under the border search exception are critical for preventing cross-border crime and the importation of contraband" but "given the sheer mass of intimate information available in a forensic search, the government may rely on the border search exception to conduct such a search" [only where it can] "show that it possesses 'individualized suspicion of an offense that bears some nexus to the border search exception's purposes" which includes among other things "evidence of ongoing transnational criminal activity") (citing *United States v. Kolsuz*, 890 F.3d 133, 143-44 (4th Cir. 2018) and *United States v. Aigbekaen*, 943 F.3d 713, 721 (4th Cir. 2019)).

8

Moreover, even if, as Defendant urges, the border exception were limited to subjective "border" purposes, the Government's "interest in preventing crime at international borders 'is at its zenith' and it follows that a search for evidence of either contraband or a cross-border crime furthers the purposes of the border search exception to the warrant requirement." *Alasaad v. Mayorkas*, 988 F.3d 8, 19 (1st Cir. 2021). Likewise, in *United States v. Carpenter*, the trial court recognized that the border exception applies if the search furthers "a sovereign interest underlying the exception whether by preventing the entry of people or contraband, investigating cross-border crime, collecting or regulating duties, or otherwise safeguarding national security." No. 20 CR 376-2, 2023 WL 358794, at *4 (N.D. Ill. Jan. 23, 2023).

Here, the search did, in fact, involve such sovereign "border" purposes. Initially, CBP suspected that Hussain may have committed marriage fraud, having admitted to traveling two years in a row, with just under $10,000 in United States currency, to "marry" a woman in Yemen; CBP also suspected possible import tax evasion, based upon the discrepancy between Hussain's admission of carrying 6 to 7 cartons of cigarettes and his failure to declare "commercial merchandise" on his customs form. Once CBP accessed Hussain's phone those concerns were trumped by new concerns about transnational criminal child sexual assault. *Mendez* confirms that "routine or otherwise, searches at the border 'never' require a warrant or probable cause." *Id*. at 1307 (citing *United States v. Ramsey*, 431 U.S. 606, 619 (1977)). This Court thus rejects any claim by Defendant that CBP needed a warrant to seize and search his cellphone at the border.

9

Nor did CBP require reasonable suspicion to manually search Defendant's cellphone at the border. In *Mendez*, the court held that "brief, manual searches of a traveler's electronic device are 'routine' border searches requiring no individualized suspicion." 103 F.4th at 1310 (citations omitted). As a result, this Court need not consider the question of reasonable suspicion to find the agent's inspection lawful. Were the Court to consider the question, however, it would find that CBP possessed more than reasonable suspicion to conduct the initial, manual, scrolling search of Defendant's cellphone, as well as the subsequent forensic examination of the phone.

CBP Officer Diamond testified that, upon initial screening, Hussain responses indicated that he possessed undeclared alcohol or tobacco products or otherwise triggered the need for further questioning on secondary inspection. [85] at 13; [74-9]. On secondary inspection, CBP Officer Pila confirmed that Hussain had 6 to 7 cartons of cigarettes, as well as very little money (compared to what he carried out of the country), and a suspicious marriage story to explain his travel, one he had used just one year earlier. [85] at 31–33, 39–40. Because Hussain appeared to be lying about the purpose of his travel to Yemen—and potentially committing marriage fraud and tax evasion—Pila, based upon her training and experience, referred Defendant to TTRT screening. There, Officer Sepulveda observed likely child pornography immediately upon accessing Hussain's photo gallery. Special Agent Ilg confirmed the illegal nature of the images and videos on Hussain's phone and, in consultation with the United States Attorney's Office, secured a warrant, which ultimately lead to the discovery of more than two thousand images and videos of child pornography, some

10

of which involved infants and toddlers. [74-7] at 2–3; [75] at 1. Nothing about this series of events offends the Constitution.

In *Mendez*, after an initial search involving scrolling through Mendez's cellphone photo gallery, CBP "conducted a more extensive, 'forensic' examination of Mendez's devices," used a data extraction technology to download a copy of the devices' photos and videos, then seized Mendez's cellphones, while allowing him to leave. 103 F.4th at 1305. The court held that it need not consider whether CBP's extensive forensic search required "individualized suspicion" because "customs agents had that and more once they found illicit images and videos of children on Mendez's phone during the routine search." *Id.* at 1310–11. The holding applies with equal force to Hussain. As in *Mendez*, CBP had reasonable suspicion and more once they found illicit images and videos of children on Hussain's phone during the routine border search. Thus, as in *Mendez*, the Court denies the motion to suppress.

The Court's ruling today, particularly in light of *Mendez*, with its almost identical fact pattern, should come as no surprise. As the Seventh Circuit noted there, "in more than 200 years of border search precedent, neither the Supreme Court nor we have ever found a border search unconstitutional." 103 F.4th at 1307. This case offers no basis to deviate from that long-standing precedent.

11

## III. Conclusion

For the reasons explained, the Court denies Defendant's motion to suppress [74].

Date: July 23, 2024

ENTERED:

John Robert Blakey
United States District Judge